David M. Stein (Bar No. 198256)
dstein@olsonstein.com
Nancy M. Olson (Bar No. 260303)
nolson@olsonstein.com
OLSON STEIN LLP
240 Nice Lane, Suite 301
Newport Beach, CA 92663
Tel: (949) 887-4600

Matthew G. Berkowitz (Bar No. 310426)
mberkowitz@reichmanjorgensen.com
Jeff Leung (Bar No. 310960)
jleung@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Tel: (650) 623-1401
*[Additional counsel listed on signature page]*

*Attorneys for Defendant and Counterclaim Plaintiff Corent Technology, Inc.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| SAP AMERICA, INC.,<br>Plaintiff,<br>vs.<br>CORENT TECHNOLOGY, INC.,<br>Defendant. | Case No. 8:26-cv-00237-JVS-(DFMx)<br>Judge: Hon. James V. Selna<br>**CORENT'S OPPOSITION TO SAP'S MOTION TO DISMISS CORENT'S AMENDED COUNTERCLAIMS (DKT. 59)** |
| CORENT TECHNOLOGY, INC.,<br>Counterclaim Plaintiff,<br>vs.<br>SAP AMERICA, INC. and SAP SE,<br>Counterclaim Defendants. | Judge: Hon. James V. Selna<br>Date: September 21, 2026<br>Time: 1:30 p.m.<br>Courtroom: 10C<br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS


INTRODUCTION ........ 1

I. BACKGROUND ........ 2

  A. Cloud Computing and Software-as-a-Service ........ 2

  B. Corent's Inventions ........ 4

    1. The '372, '876, and '591 patents ........ 4

    2. The '136 and '893 patents ........ 8

    3. The '761 patent ........ 10

II. ARGUMENT ........ 11

  A. All Asserted Claims Are Eligible at Step One. ........ 12

    1. The claims satisfy step one because they are directed to technological solutions to technological problems unique to multi-tenant cloud networks. ........ 13

      a) The claim language demonstrates eligibility. ........ 13

      b) The claims fit comfortably within the Federal Circuit's caselaw. ........ 17

      c) SAP oversimplifies the claims by ignoring the claim language in favor of § 101 buzzwords. ........ 20

  B. All Asserted Claims Are Eligible at Step Two. ........ 21

    1. Corent's claims are unconventional. ........ 22

    2. SAP cannot meet its step two burden on a motion to dismiss. ........ 24

CONCLUSION ........ 24

# TABLE OF AUTHORITIES

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121 (Fed. Cir. 2018) ........ 12, 24

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014) ........ 12, 21

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288 (Fed. Cir. 2016) ........ 22

*BASCOM Global Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016) ........ 23

*Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018) ........ 12, 21, 22, 24

*CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358 (Fed. Cir. 2020) ........ 13

*Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306 (Fed. Cir. 2019) ........ 24

*Contour IP Holding LLC v. GoPro, Inc.*, 113 F.4th 1373 (Fed. Cir. 2024) ........ 11, 12, 13, 21

*Cooperative Ent., Inc. v. Kollective Tech., Inc.*, 50 F.4th 127 (Fed. Cir. 2022) ........ 24

*CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091 (Fed. Cir. 2021) ........ 22

*Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999 (Fed. Cir. 2018) ........ 18, 20

*DataTern, Inc. v. Microstrategy, Inc.*, No. 11-cv-11970, 2015 WL 5190715 (D. Mass. Sept. 4, 2015) ........ 19

*DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014) ........ 13, 18, 19

*Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016) ........ 20

*Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016) ........ *passim*

*Mosaic Brands, Inc. v. Ridge Wallet LLC*,
55 F.4th 1354 (Fed. Cir. 2022)........................................................................24

*Ollnova Techs. Ltd. v. ecobee Techs. ULC*,
No. 2025-1045, 2026 WL 1596936 (Fed. Cir. June 4, 2026)...........................19, 20

*PersonalWeb Techs. LLC v. Google LLC*,
8 F.4th 1310 (Fed. Cir. 2021)......................................................................19, 20

*PowerBlock Holdings, Inc. v. iFit, Inc.*,
146 F.4th 1366 (Fed. Cir. 2025)......................................................................21

*RJ Tech., LLC v. Apple, Inc.*,
No. 22-cv-01874, 2023 WL 3432237 (C.D. Cal. Mar. 23, 2023)..........................19

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
930 F.3d 1295 (Fed. Cir. 2019)......................................................................18

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed. Cir. 2020)...................................................................21, 24

*Uniloc USA, Inc. v. LG Elecs. USA, Inc.*,
957 F.3d 1303 (Fed. Cir. 2020)......................................................................12

*Universal Elecs. Inc. v. Roku, Inc.*,
No. 18-cv-01580, 2019 WL 1877616 (C.D. Cal. Mar. 5, 2019) (Selna, J.) .....13, 19

*Visual Memory LLC v. NVIDIA Corp.*,
867 F.3d 1253 (Fed. Cir. 2017)......................................................................13

**INTRODUCTION**

Corent is a California-based operating company with a portfolio of cloud-computing products. Its technologies enable software migration from local on-premises systems to the cloud, partition and orchestrate that software across different cloud architectures, and monitor usage within a multi-tenant system. The asserted patents reflect and protect Corent's innovations. They claim inventive techniques and architectural advancements that solve specific technological problems facing multi-tenant systems in cloud environments. These advancements fall within the heart of patent-eligible improvements to computer technology.

SAP's arguments to the contrary rest on overgeneralizations divorced from the claim language and the applicable legal standard. Its flawed analogies to libraries and abstract do-it-on-a-computer patents improperly disregard the claims' express limitations and their resulting computing improvements. The Federal Circuit has repeatedly rejected that approach to the eligibility analysis. Under the correct standard, the claims are not abstract; they are necessarily rooted in computer technology, disclose concrete architectural solutions to problems facing multi-tenant cloud networks, and describe precisely how to implement the claimed improvements.

In any event, SAP's arguments ignore Corent's allegations and present fact disputes inappropriate for resolution on a Rule 12(b)(6) motion. Under binding precedent, SAP cannot meet its burden at the pleading stage to clearly and convincingly establish the patents' invalidity in light of Corent's allegations and each specification's recited improvements to the claimed computer systems.

In short, because Corent's claims disclose concrete technological solutions to specific problems facing computer systems, they are patent eligible under established Federal Circuit law. SAP's motion should therefore be denied.

# I. BACKGROUND

## A. Cloud Computing and Software-as-a-Service

The inventions in this case[1] solve various technological problems related to creating, orchestrating, and monitoring cloud-based software applications. *See* Dkt. 57 (Corent's "Counterclaims") ¶¶ 30-60.

As the internet revolution took hold in the early 2000s, most companies ran software applications with a single copy of the software (an "instance") for each group of users (a "tenant") with access to the same dataset. *See* '372 patent at 2:64-66 (defining "tenant" as a "collection of users that share logically isolated data and content"). This is referred to in the art as a "single-tenant" system. *Id.* 2:30-34. As Corent's patents recognize, single-tenant systems have significant drawbacks. *Id.* 1:24-31. For example, single tenancy requires that each tenant—*e.g.,* a business or other organization—own and host its own set of servers and infrastructure, increasing cost and complexity.

So the market turned to multi-tenant systems. Counterclaims ¶¶ 30-31. As the '372 patent puts it, when "running software on large networked environments," it is "advantageous to execute a single instance of the application on one server by multiple tenants instead of executing separate instance of the application." '372 patent at 1:19-23. In particular, multi-tenant systems allow separate tenants to use a single software instance on a pay-for-service basis, often referred to in the field as "Software-as-a-Service," or SaaS. Counterclaims ¶ 31. Today, many software applications run as SaaS multi-tenant offerings. *Id.* ¶¶ 31-32. As just one example, Microsoft's SharePoint system allows multiple companies to access the same software instance. Users at those

---

[1] Corent's asserted patents are U.S. Patent Nos. 11,019,136 ("'136 patent"), 10,320,893 ("'893 patent"), 9,495,372 ("'372 patent"), 10,305,761 ("'761 patent"), 8,326,876 ("'876 patent") and 10,824,591 ("'591 patent"). The patents and their claim language are available on the docket, *see* Dkt. 57, and Corent has reproduced claim 1 of each patent in the attached Appendix 1 for the Court's convenience.

companies avoid concerns like hosting their own servers, while providers like Microsoft can centrally scale resources according to demand. *See id.*; *see also* '136 patent at 1:32-42 ("[M]igrat[ing] ... previously localized systems into the cloud" offers advantages including "efficient allocation of resources, cost-effective scalability, improved reliability, improved security, and greater accessibility").

Before Corent's patented technology was introduced, multi-tenancy presented a host of fundamental technological hurdles. Counterclaims ¶¶ 33-42. For starters, the system required the ability to isolate and secure data from one tenant to another. *See* '372 patent at 3:23-28 (recognizing need to "install an application designed for single-tenant use onto a multi-tenant system to be used by multiple tenants without needing to share data"). There were also technical challenges involved in migrating customers from legacy single-tenant systems to the cloud and accommodating different cloud providers, each of which have different configurations, tools, and available resources. Counterclaims ¶ 33. And even after a company migrates to the cloud, it must "orchestrate" its applications across various cloud resources, databases, data centers, and devices, each of which may be incompatible with one another. *Id.* ¶¶ 34-41; '136 patent at 1:46-48.

Once a company migrates and sets up an orchestration paradigm, there are additional problems associated with monitoring and assigning cloud resources. Counterclaims ¶ 87. Unlike single-tenant systems, multi-tenant cloud environments present unique monitoring (or "metering") problems because different tenancies consume resources from the same instance and server. *Id.* ¶¶ 87-88; *see* '761 patent at 1:51-58 (recognizing "a particular need ... to monitor [a] user's consumption of cloud resources and/or SaaS services" in a "cloud environment"). Without the ability to "meter each user's use of any applications, and each application's use of cloud resources," "cloud operators" lack the means "to more efficiently assign and bill for available resources." *Id.* 3:56-4:2.

Corent's innovative products and its corresponding asserted patents address these multi-tenancy problems.

**B. Corent's Inventions**

Founded in 2000, Corent delivers SaaS software applications more rapidly, efficiently, and cost effectively. Counterclaims ¶¶ 3-9. Corent's leaders understood what others in the field had yet to realize: that new systems and architectures would be required to efficiently transform single-tenant systems to multi-tenant SaaS applications, and that, once that transformation occurred, orchestration mechanisms would be required to efficiently and strategically use and assign cloud resources. *Id.* Corent's resulting innovations led to the development of products that have received widespread industry acclaim. *Id.* ¶ 9. Corent's products—developed by its team of dozens of engineers—allow companies to, among other things, migrate local applications to the cloud, enable multi-tenant systems, monitor cloud resource usage, and orchestrate cloud resources. *Id.* ¶ 8.

Corent relies on the patent system to protect the valuable technology and inventions that result from its efforts. Unfortunately, SAP and other companies have hurt Corent's market positioning by offering products that migrate customers to the cloud and then orchestrate and meter in ways that infringe Corent's patent rights. The six asserted patents here reflect Corent's breakthroughs in cloud computing.

**1. The '372, '876, and '591 patents**

These three patents share a specification and disclose a specific architecture for rapidly and easily transforming any single-tenant application to allow it to operate in multi-tenant infrastructure. *See, e.g.*, '372 patent at 2:37-42; Counterclaims ¶¶ 80-82, 93-95, 100-02.

Figure 1 of the patents illustrates the conventional prior art single-tenant—or in the language of the patents, "non-tenant aware"[2]—system:




**Figure 1A (prior art)**

**Figure 1B (prior art)**

In that prior art, the software application instance [110] communicates with the database connector [120] "via non-tenant-specific data access commands." *Id.* '372 patent at 6:58-7:8. The database connector then executes those commands on the data repository [130]. *Id.*; *see also id.* 2:55-61. In this conventional configuration, a "single user may open multiple application instances on the same computer ... but the user typically only accesses a single data repository … from the application." *Id.* 7:3-8.

This conventional architecture made it very cumbersome to convert applications for use in a multi-tenant system. *See id.* 1:19-2:29; Counterclaims ¶¶ 81, 94, 101. Among other issues, conventional systems generally required a "great deal of time and effort" to "specifically configure[]" and "customize" each underlying application to accomplish the transformation. '372 patent at 1:19-2:29. Those clunky systems

---

[2] '372 patent at 3:7-10 (defining a "non-tenant aware" application as "one that that has not been programmed with the ability to differentiate one tenant user from another tenant user").

uniformly "fail[ed] to provide a simple way for a single-tenant application to be installed into a multi-tenant architecture without programmatically altering the application architecture." *Id.*

In light of these flawed approaches, Corent recognized "a need for improved methods of transforming a single-tenant application to have multi-tenant capability without significantly altering the original single-tenant architecture." *Id.* 2:30-34. These patents solve that problem. Counterclaims ¶¶ 81-82, 94-95, 101-02. They each disclose concrete techniques and architectures that "allow[] a user to install an application designed for single-tenant use onto a multi-tenant system to be used by multiple tenants without needing to share data between tenants or to programmatically alter the application to be used with the system." '372 patent at 3:23-28; *compare id.* 2:1-9 (Chang prior art reference disclosing programmatic alterations).

Figure 2 of the patents provides a high-level illustration of how the disclosed techniques and architectures accomplish the transformation:




**Figure 2**

In particular, Figure 2 contrasts the disclosed software architecture against the prior art; an "agile database connector" (outlined in **green**) is situated between the application instance and the database connector and is "configured to adapt to data access commands from an application that does not include any tenant-specific information by translating non-tenant-specific data access commands into tenant-specific data access commands." *Id.* 7:9-29. To execute the translation, the connector uses "a unique identifier associated with the data access command to infer ... the appropriate tenant associated with the data access command." *Id.* 7:31-33.

Figure 2 further reveals how this architecture enables multi-tenancy. It shows multiple "tenants" (outlined in **red**), each associated with multiple user sessions. By using this new architecture with the agile database connector, the same cloud-based software instance can be used with "tenant [211]" and separate "tenant [215]," (along with multiple user sessions for each). Figure 2 additionally illustrates segregated databases associated with each tenant (outlined in **blue**). These databases are separately accessible depending on the tenant; the agile database connector communicates with the database connector to route the commands to and from the appropriate database depending on the associated tenant identifier. *Id.* 7:9-7:33.

By deploying these architectural improvements and techniques, any software application can be converted into a multi-tenant cloud-based SaaS application. Corent's allegations track these disclosed advantages and improvements. *See, e.g.*, Counterclaims ¶¶ 81-82 (alleging that, "by, for instance, using a new architecture," "[t]he '372 Patent solves technological problems that exist when a company or system wishes to adapt a non-tenant aware (single-tenant) system to a multi-tenant system"); *see also* ¶¶ 94-95 (similar as to '876 patent); ¶¶ 101-102 ('591 patent).

The asserted claims teach specific implementations of this solution, as the corresponding claim language shows. *See* Appx.1. For example, claim 1 of the '372 patent reflects the above inventive architectural improvements, including the specifics

of the "agile database connector," its logical location within the architectural framework, and the tenant identifiers. *Id.* Claim 1 of the '876 patent details architectural advancements that allow the system to convert data access commands into tenant-specific commands after the conversion has been authorized. *Id.* And whereas the '372 and '876 patents address systems involving a single data repository, claim 1 of the '591 patent introduces a method for coordinating concurrent, tenant-specific access across multiple databases. *See id.*; *see also* '372 patent fig.2 (illustrating how the disclosed architecture accommodates multiple data repositories).

**2. The '136 and '893 patents**

The '136 and '893 patents share a specification and solve technological problems associated with migration and orchestration in a multi-tenant environment. *See* Counterclaims ¶¶ 66-67, 73-74. Corent's inventors observed that, "as cloud resources have become available, there has been a push to migrate ... previously localized systems into the cloud." *See, e.g.*, '136 patent at 1:35-39. But they recognized that "numerous issues ... arise in executing such migrations." *Id.* 1:43-44; Counterclaims ¶¶ 67, 74. For example, they recognized that "many applications are not well suited to a particular cloud environment" both because "cloud environments and their resources are available in a wide variety of configurations and may not pair well with the application's requirements" and "legacy applications may fail to take advantage of the additional resources offered by a cloud environment and/or ... run inefficiently in a cloud." '136 patent at 1:42-51; Counterclaims ¶¶ 67, 74. They accordingly recognized "a need for systems and methods that efficiently adapt legacy software applications so they may take advantage of the resources and benefits of a cloud environment." '136 patent at 1:60-64.

To that end, the specification explains that, before migration, it is important to "match and compare" the local applications' "hardware, software, network, and other application environment resources" with those available in the cloud. *Id.* 1:51-56. The

’136 and ’893 patents solve that problem by creating a logical partition architecture. Counterclaims ¶¶ 67-68, 74-75.

Figure 1 illustrates the solution:




**FIGURE 1**

In Figure 1, the application [10] “represents a typical non-tenant aware application or a tenant-aware SaaS application” that contains individual workloads (*i.e.*, the individual units of compute of an application). ’136 patent, 6:20-27. The disclosed architecture “establishes one or more partition groups” (*e.g.*, [40], outlined in **red**) and “group[s] [the] workloads together ... based on ... characteristics and/or dependencies with other modules.” *Id.* 6:32-36.

This partitioning architecture is not conventional; it improves multi-tenant systems by allowing the system to efficiently map workloads to available cloud resources and "effectively consider factors such as cost, scalability, performance, and security inherent in the use of cloud resources before" deploying the application. *See id.* fig.2; 1:67-2:2. Corent's allegations again track these disclosed improvements. *See* Counterclaims ¶ 67 (alleging that the "'136 Patent solves at least two technological problems found within cloud systems: the migration of non-tenant aware applications to the cloud, and, postmigration, the orchestration and mapping of the migrated workloads"); ¶ 74 (same as to '893 patent).

The claim language details the system. *See* Appx.1. Claim 1 of the '136 patent is directed to a specific, multi-step algorithm for configuring how application workloads are partitioned, grouped, assigned, and evaluated across cloud resources. *Id.* The '893 patent discloses a distinct system architecture. Claim 1 of that patent claims a set of interacting processing engines that collectively configure, partition, and assign workloads using rule-driven logic. *Id.*

**3. The '761 patent**

The '761 patent tackles a specific technical problem unique to multi-tenant computing: how to accurately attribute resource usage to individual tenants in a shared system. Counterclaims ¶¶ 87-88. In particular, it is directed to "[a]n accurate monitoring system for a multi-tenant system" that "monitors each data stream of the multi-tenant system and determines the identity of the tenant using each of the data streams." *See* '761 patent at Abstract.

As discussed, *supra* pp.2-4, "[o]nce one or more software applications are available for operation in one or more cloud environments, it is desirable to measure and/or meter each user's use of any applications, and each application's use of cloud resources," *id.* 3:56-59, which "allows cloud operators to more efficiently assign and bill for available resources," *id.* 3:66-4:2. Prior systems could not reliably perform

tenant-specific metering in shared environments because they necessarily intermingled tenant usage data. *See* Counterclaims ¶ 87 (alleging that, "[p]rior to this invention, there was no available mechanism to monitor usage on a tenant-by-tenant basis in a multi-tenant system; this patent enables the ability to measure what was previously unmeasurable by conventional systems").

As illustrated in Figure 2, the patent responds to that problem by introducing a specific architectural system that monitors individual data streams, maps them to tenant identities, and aggregates usage at multiple levels. *See id.* fig.2. For instance, the patent introduces an architecture requiring a "tenant identity manager" [901] and "an application identity manager" [1001], neither of which were necessary or relevant in conventional single-tenant systems. *See supra* pp.2-4. The disclosed system and methods monitor data streams and leverage the tenant and application identity managers to identify the particular user or group of users using particular applications. *See* '761 patent cl.1.

The specification identifies the "drastic[]" improvement resulting from this arrangement: "By specifically monitoring targeted aspects of each data stream [associated with each tenant], aggregating the data into separate buckets, and creating summarized repo[r]ts, the system drastically improves the ability for [multi-tenant] systems to bill specific tenants with a greater accuracy, and/or target the most resource-intensive tenants for throttling." *Id.* 6:24-30; *see also id.* 11:24-30; 6:30-37 (describing a throttling functionality that can limit a user or group of users after total aggregate activity exceeds a threshold).

## II. ARGUMENT

The Supreme Court has established a two-step test to determine whether a patent is eligible under 35 U.S.C. § 101. *Contour IP Holding LLC v. GoPro, Inc.*, 113 F.4th 1373, 1378 (Fed. Cir. 2024). As relevant here, step one asks "whether the claims at issue are directed to … an abstract idea." *Id.* If so, step two asks "whether the claims

recite something significantly more than an abstract idea itself." *Id*. 1378-79 (cleaned up). Courts must "tread carefully" in applying the abstract idea exception "lest it swallow all of patent law." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014).

SAP bears the burden of overcoming the presumption of validity and eligibility at both steps. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018) (requiring clear and convincing evidence). Compounding that burden, all facts are construed in favor of eligibility on a Rule 12(b)(6) motion. *See Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018).

Here, each of the asserted claims is directed to concrete techniques and architectural improvements that solve specific technological problems arising in multi-tenant cloud networks. SAP's arguments to the contrary improperly employ a divide-and-conquer strategy—slicing off pieces of the invention, oversimplifying them, and comparing them to similar-sounding cases to suggest that each ingredient alone is abstract. When properly read as a whole, the claim language refutes SAP's arguments. In any event, SAP cannot meet its burden at step two; at most, its characterizations of the claims raise factual disputes that cannot be resolved on a motion to dismiss.

### A. All Asserted Claims Are Eligible at Step One.

At step one, examining "the focus of the claimed advance over the prior art" is crucial to determining what the claims are directed to. *Contour*, 113 F.4th at 1379 (attribution omitted). The inquiry involves "ascertaining the basic character of the claimed subject matter," taking care to "avoid describing the claims at a high level of abstraction, divorced from the claim language." *Id*. (cleaned up).

"To determine the focus of the claimed advance," courts examine "whether the claims are directed to a specific means or method that improves the relevant technology," as distinct from a "result or effect." *Id.* (cleaned up). An asserted "improvement to computer functionality itself," with specific means to achieve it, is

not abstract. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016); *see also Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1309 (Fed. Cir. 2020) ("[S]oftware can make patent-eligible improvements to computer technology, and related claims are eligible as long as they are directed to non-abstract improvements to the functionality of a computer or network platform itself."). In short, the question is whether "[t]he claims are directed to a technological solution to a technological problem." *Contour*, 113 F.4th at 1380; *accord Universal Elecs. Inc. v. Roku, Inc.*, No. 18-cv-01580, 2019 WL 1877616, at *8 (C.D. Cal. Mar. 5, 2019) (Selna, J.).

**1. The claims satisfy step one because they are directed to technological solutions to technological problems unique to multi-tenant cloud networks.**

Corent's inventions respond to specific technological problems and provide just the sort of concrete technological solutions the Federal Circuit has held eligible time and again. *See, e.g.*, *Contour*, 113 F.4th at 1379-81; *Enfish*, 822 F.3d at 1335-39.

That conclusion is only reinforced by Corent's allegations and the specifications' recited improvements to the underlying technology. *Supra* pp.4-11. At the pleading stage, courts must accept the specification's identification of "advantages gained by the elements recited in the claimed invention … as true and consider them important in conducting the step-one inquiry." *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1369-70, 1373 (Fed. Cir. 2020); *see also Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1260 (Fed. Cir. 2017) (reversing district court's ineligibility finding where "the specification discusses the advantages offered by the technological improvement").

**a) The claim language demonstrates eligibility.**

Each asserted claim is directed to a specific architecture or technique to enable and improve multi-tenant cloud networks, providing a solution "necessarily rooted in computer technology" and explaining in concrete terms how to achieve it. *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014).

**The ’372, ’876, and ’591 patents.** The claims recite a concrete architectural solution that departs from and improves prior ways of adapting a single-tenant application to have multi-tenant capability. *See supra* pp.4-8 (describing the improved agile database connector architecture present in all three patents).

The claim language details precisely how to implement the claimed architecture, including dictating where each architectural block is logically positioned and the way in which the system processes inputs and outputs. In particular, the *agile database connector* is an “interface module” constituting a separate architectural block, logically positioned between the application and the database, that “translate[s] ... non-tenant specific data access commands ... into tenant-specific data access commands ... using the inferred unique tenant identifiers.” *See* ’372 patent cl.[1a-b]; ’876 patent cl.[1f] (requiring “an interface module logically disposed between the non-tenant aware application and the at least one data repository”); ’591 patent cl.[1a] (requiring “a tenant-aware translator between the non-tenant-aware application and at least one of the first tenant-aware data repository and the second tenant-aware data repository”). The *agile database connector* is not a generic intermediary; it is a specific, unconventional component required to be arranged in a specific way that reconfigures how a non-tenant aware application interacts with a database. *See supra* pp.4-8.

The claims further dictate how the interface module architecture allows the system to process information and deliver the required “output[s].” *See id.* cl.1. For example, the ’372 patent requires that commands pass through an intermediary component while outputs bypass it. *See supra* pp.4-8; *see also* ’372 patent cl.[1d]. Likewise, the ’876 patent requires that the interface module only processes information “where needed.” *Id.* 3:29-43; ’876 patent cl.[1]. After accessing the unique identifier associated with the tenant, “the interface module ... use[s] [it] to modify the non-tenant-specific data access command into a tenant-specific data access command without needing the application to be tenant-aware.” *Id.* 3:46-51. Claim 1 further requires a

*handler* that determines whether a given command should be processed at all. *Id.* 3:46-50;'876 patent cl.[1i]. The '591 patent similarly requires a coordinated sequence of steps—external identity retrieval, *id.* [1a][i-ii], tenant-dependent modification of commands, *id*. [1a][iii], and execution across multiple data repositories, *id.* [1b]—that operates under concurrent conditions. This set of steps "handle[s] concurrent requests sent from different application instances" such that the agile database connector "could be configured to serialize each tenant-specific data access command to be sent to database connector [230]." *Id.* 8:58-9:22. The claims therefore define rule-based mechanisms that govern how commands are processed through the system—not just the result of processing.

The specification confirms that the claims provide concrete architectural advancements over the prior art. They allow "an application instance [to] be used in [a] multi-tenant system without needing to modify the application instance," resolving the need in the prior art to specifically reprogram it, *supra* pp.4-8. The claims' specific requirements further "improv[e] performance" in the system by, for example, "preventing gridlock in the underlying database facilities," *id.* Ultimately, "by providing an interface module that translates data access commands," "the disclosed techniques provide many advantageous technical effects including the ability to easily and quickly install a non-tenant aware application into a [multi-tenant] database system." *Id.* 6:19-25.

**The '136 and '893 patents.** The claims of the '136 and '893 patents recite an improved computer architecture that transforms a legacy, non-tenant-aware application into a set of coordinated workload partitions that can be efficiently deployed and executed in a distributed cloud environment. *See supra* pp.8-10 (describing the partitioning architecture).

Claim 1 of the '893 patent teaches a structured arrangement of components—scanning, partitioning, mapping, and rendering engines, each governed by rule

databases—that together transform how applications are deployed across the system. *See* '893 patent cl.1. The specification explains that the *scanning engine* identifies workloads and their characteristics, while the *partitioning engine* organizes those workloads into executable groups, enabling efficient deployment. *See id.* 2:20-27; *see also supra* pp.8-10 (describing the unconventional nature of the partitioning architecture and Corent's allegations pertaining to the same). The claim requires that each engine applies defined rule sets and that the output of one engine feeds into the next, forming a coordinated processing pipeline. *See* '893 patent cl.1. The '136 patent discloses a specific method implementing this architectural solution: (i) the *identifying* step analyzes application components and dependencies, *see id.* 3:62-67, 6:23-27; (ii) the *grouping* and *assigning* steps partition workloads and match them to cloud resources based on performance factors, *see id.* 3:55-61, 7:48-51; and (iii) the *mapping* and *ranking* steps generate and evaluate multiple deployment configurations, *see id.* 3:22-31; *see* '136 patent cl.1. The claims therefore reflect a specific arrangement of components that changes how the system operates.

The specification establishes that this architecture enables evaluation and selection of optimal workload assignments, including contingency configurations, improving system performance and flexibility. *See* '893 patent at 2:58-62. In particular, dependency-aware workload identification enables compatible and efficient execution, *see* '136 patent at 3:62-67; partitioning and grouping transform applications into modular, scalable units, *see id.* 6:23-27, 7:48-51; rule-based assignment improves performance, cost efficiency, and resource utilization, *see id.* 3:55-61; and generation and evaluation of multiple deployment configurations enable optimization across competing constraints, *see id.* 3:26-31.

**The '761 patent.** Claim 1 of the '761 patent addresses technical problems particular to multi-tenant systems, including how to differentiate usage by different tenants each accessing the same software instance. *See supra* pp.10-11. It teaches a

system that performs granular, instance-level monitoring, in which data streams are tracked, labeled, and associated with a specific tenant. ’761 patent cl.1; *see also* ’761 patent at 6:24-30, 11:24-30. These data streams are aggregated across user instances and defined zones to produce tenant-specific usage metrics. *See id.* 11:39-59. By linking instance-level activity, tenant identity, and aggregated usage, the system enables accurate attribution of resource usage in shared environments, solving a problem unique to multi-tenant systems. *See supra* pp.10-11; Counterclaims ¶¶ 87-88.

The ability to monitor tenant-specific resource usage in shared systems delivers a host of practical applications that improve the system’s performance, including the ability to “efficiently ... assign available resources.” *Supra* pp.10-11; Counterclaims ¶¶ 87-88. Because the claim covers a specific implementation of how this solution is achieved—through coordinated monitoring, identity mapping, and multi-level aggregation—it is directed to a technological improvement in system functionality, not an abstract idea.

**b) The claims fit comfortably within the Federal Circuit’s caselaw.**

**1.** The Federal Circuit has repeatedly found architectural advancements and defined techniques just like those here to be eligible.

Start with *Enfish*. The *Enfish* patents were “directed to an innovative logical model for a computer database”—that is, “a model of data for a computer database explaining how the various elements of information are related to one another.” 822 F.3d at 1330. The patents claimed a “self-referential” table that improved on the conventional “relational” model in which each data entity has a separate table. *Id.* There, as here, the specifications taught that technical “benefits flow from this design.” *Id.* 1333 (“faster searching,” “more flexibility”). And just as Corent’s claims improve the functionality of multi-tenant cloud networks, the *Enfish* claims’ focus was “an

improvement to computer functionality itself," not "economic or other tasks for which a computer is used in its ordinary capacity." *Id*. 1336.

"In sum," *Enfish*'s self-referential table was "a specific type of data structure designed to improve the way a computer stores and retrieves data in memory." 822 F.3d at 1339. So too with Corent's claims. The claimed architectures here offer "a specific type of data structure designed to improve the way" data is processed and routed in a multi-tenant cloud environments. *Enfish*, 822 F.3d at 1339. The claims provide concrete solutions, not mere functional aspirations. And they therefore "are directed to a specific implementation of a solution to a problem" arising in multi-tenant systems. *Id*.

Another computer architectural improvement carried the day in *Data Engine*. The court held that adding tabs to spreadsheets was a "specific solution to then-existing technological problems in computers and prior art electronic spreadsheets." *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1007-08 (Fed. Cir. 2018). The tabs were "specific structures within the three-dimensional spreadsheet environment" that improved navigation—even though "humans have long used tabs to organize information … outside the context of electronic spreadsheets." *Id*. 1011. Corent's claimed architectures likewise provide "a specific structure …within a particular [cloud environment] that performs a specific function." *Id*. 1010-11.

And in *DDR*, 773 F.3d at 1256-59, the claims were eligible because they involved "overrid[ing] the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink" to "solve a problem faced by websites on the Internet." *Id.* 1258-59. Corent's claims here likewise override the conventional operation of single-tenant systems to "specify how interactions with the [system] are manipulated to yield a desired result" and provide solutions to "problem[s] specifically arising in the realm of computer networks." *Id.* 1257-58. *See also SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1304 (Fed. Cir. 2019) (finding eligibility where the

"claim improves the technical functioning of the computer and computer networks by reciting a specific technique for improving computer network security"). The '761 patent, for example, addresses problems unique to multi-tenant systems, analogous to the problems solved in *DDR* that were specific to websites.

The Federal Circuit's recent decision in *Ollnova Techs. Ltd. v. ecobee Techs. ULC* reinforces its precedent. No. 2025-1045, 2026 WL 1596936, at *13 (Fed. Cir. June 4, 2026). The panel held that claims to a wireless automation device and component were eligible because they recited "a specific technology-based improvement in the operation of a network," including "timing constraints" and "a conditional transmission trigger" governing network communications, rather than abstract data collection and transmission. *Id.* In doing so, the court found that the claims were not merely directed to a result, "but to a defined technique for achieving such results." *Id.* *13-14. Here, the claims similarly require rule-based mechanisms that dictate a defined data-flow architecture. *See supra* pp.2-11.

This Court and other district courts have consistently applied these principles to find that claims involving technological improvements like those here are eligible. *See, e.g.*, *DataTern, Inc. v. Microstrategy, Inc.*, No. 11-cv-11970, 2015 WL 5190715, at *1, *8 (D. Mass. Sept. 4, 2015) (finding that a claim involving an interface between an application and a database was eligible because it was "directed at solving a problem that specifically arises in the realm of computing"); *RJ Tech., LLC v. Apple, Inc.*, No. 22-cv-01874, 2023 WL 3432237, *4, *6 (C.D. Cal. Mar. 23, 2023); *Universal Elecs.*, 2019 WL 1877616, at *8.

**2.** SAP's lead cases support Corent, not SAP. They illustrate why Corent's inventions are concrete technological improvements.

The claims in *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310 (Fed. Cir. 2021), broadly described a three-step process: "using a content-based identifier generated from a hash or message digest function," comparing it "against something

else," and providing or denying access to or deleting data. *Id*. 1315. That reduced to "the abstract idea of using a content-based identifier to perform an abstract data management function." *Id*. 1317. Those processes "long predated computers" and did not improve how they worked; they were like librarians using call numbers to identify and control access to books. *Id*. 1316-18. That is a far cry from Corent's inventions. Unlike PersonalWeb's generic method, Corent's claims cover specific architectures with technical benefits rooted in a particular technological context. Characterizing Corent's system as merely using identifiers to find information would require abstracting away the claims' substance—like reducing the *Enfish* claims to a table.

Nor do the claims in *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016) bear any resemblance to Corent's. The only "advance they purport[ed] to make is a process of gathering and analyzing information of a specified content, then displaying the results," as opposed to "any particular assertedly inventive technology for performing those functions." *Id.* 1354. So those claims, unlike the claims here, merely "use[d] computers as tools," rather than providing architectures and techniques reflecting "an improvement in computers as tools." *Id.*

Finally, SAP's library and other analogies do nothing more than try to force "some real-world analogy" onto the claims. *Data Engine*, 906 F.3d at 1011. That "is not enough" because SAP's analogies fail to account for the improvements achieved by the inventions. *Id.*; *accord Ollnova Techs.*, 2026 WL 1596936 at *14 (finding analogies unpersuasive because each "fail[ed] to account for the ... challenges addressed by the inventors and the claimed improvements to device operation").

**c) SAP oversimplifies the claims by ignoring the claim language in favor of § 101 buzzwords.**

Rather than confronting the claims' specific requirements, SAP cycles through a laundry list of generalizations it says Corent's claims are directed to. These include "monitoring, aggregating, and displaying computer resource usage data"; "tracking

resources"; "translating and passing data"; "planning and optimizing assignment of tasks to resources"; "making planning and deployment decisions"; and more. Mot. 1, 3-5. SAP's various characterizations expose the fundamental problem with its arguments: Its buzzwords are "untethered from the language of the claims" and ignore the inventions' benefits over prior systems. *Enfish*, 822 F.3d at 1337.

The Federal Circuit has repeatedly rejected tactics like that. An "accurate characterization of what the claims require and of what the patent asserts to be the claimed advance" is "crucial" to the step-one analysis. *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1294 (Fed. Cir. 2020). Defendants whose "arguments ignore what plainly are important aspects of the claims and the focus of the claimed advance" cannot show ineligibility. *Id*. 1296; *accord PowerBlock Holdings, Inc. v. iFit, Inc.*, 146 F.4th 1366, 1373 (Fed. Cir. 2025) (cleaned up) ("[C]ourts must be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the[ir] specific requirements.").

* * *

In sum, all asserted claims are eligible because they are "drawn to a specific means … that improves the relevant technology." *Contour*, 113 F.4th at 1379.

**B. All Asserted Claims Are Eligible at Step Two.**

Because none of the asserted claims are directed at an abstract idea, there is no need to proceed to step two. *See Enfish*, 822 F.3d at 1339. Regardless, SAP cannot meet its burden at the pleading stage to clearly and convincingly prove that any of the claims lack an inventive concept, which implicates underlying questions of fact.

At step two, courts "consider the elements of [the] claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Alice*, 573 U.S. at 217 (cleaned up). A claim is eligible at step two when its "limitations involve more than performance of well-understood, routine, and conventional activities previously known to the

industry." *Berkheimer*, 881 F.3d at 1367 (cleaned up). The question of whether "a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact." *Id.* 1368. And as with any fact "pertinent to the invalidity conclusion," the party asserting ineligibility must prove it "by clear and convincing evidence." *Id.*

**1. Corent's claims are unconventional.**

Corent has alleged that none of the claims here present well-understood, routine, and conventional activities previously known to the industry. Rather, per Corent's allegations, which must be presumed true, each claim discloses novel architectures and techniques that paved the way for the rise of the cloud software industry. *Supra* pp.2-4.

**The '372, '876, and '591 patents.** Prior systems did not require: an intermediate architectural block that operates between the application and database using externally sourced tenant identifiers, *see supra* pp.4-8 ('372, '876, and '591 patents); routing architectures in which outputs bypass transformation components ('372 patent); conditional authorization mechanisms that determine whether translation occurs ('876 patent); or concurrent data-access handling based on tenant identifiers ('591 patent). *See Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1301 (Fed. Cir. 2016) (recognizing that new software architectures can supply an inventive concept); *CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1099 (Fed. Cir. 2021).

Corent's allegations and the shared specification confirm that these combinations provide concrete, technical benefits, including enabling multi-tenant use of a single application instance without needing to reprogram the application. *See supra* pp.4-8; *see also, e.g.*, '372 patent at 1:19-23, 2:30-34; '876 patent at 1:21-25; '591 patent at 1:17-21; Counterclaims ¶¶ 6-8, 47-48, 67-68, 74-75, 81-82, 94-95, 101-02. SAP does not address any of these allegations or the text of the patents themselves.

**The ’136 and ’893 patents.** As Corent has alleged, these patents likewise require ordered and interdependent operations that were unconventional approaches to migrating applications to cloud environments. *Supra* pp.8-10. In particular, the claims require (i) structured workload partitioning based on application characteristics; (ii) rule-based grouping and assignment tied to cloud resource characteristics; and (iii) generation and evaluation of multiple deployment configurations. ’136 patent cl.1; ’893 patent cl.1. These ordered combinations deliver specific system improvements. *See supra* pp.8-10; *see also* Counterclaims ¶ 74 (alleging that the ’893 patent “create[es] a new and unconventional architecture that creates and utilizes partitions of workloads,” which “allows for non-tenant aware applications and cloud applications and systems to effectively consider factors such as cost, scalability, performance, and security inherent in the cloud resources before deploying the application”); *id.* ¶ 67 (same as to ’136 patent). Again, SAP does not address any of these allegations.

**The ’761 patent.** The claims require a specific arrangement of monitoring, identity, and aggregation components that operate together to enable tenant-specific metering, specific to problems arising in a multi-tenant system. *Supra* pp.10-11. As Corent has alleged, this arrangement is not conventional; it changes how usage data is collected, attributed, and aggregated in shared environments. *BASCOM Global Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016); Counterclaims ¶¶ 87-88. The specification confirms that this arrangement provides concrete, technical benefits, including enabling granular, tenant-specific metering of resource usage rather than coarse, aggregate billing. *See* ’761 patent at 3:56-4:2. By allowing usage to be tracked and attributed at the individual user or tenant level, the system improves resource allocation, billing accuracy, and system management—benefits that arise from the claimed architecture itself. Counterclaims ¶¶ 87-88. SAP does not address these issues or allegations.

**2. SAP cannot meet its step two burden on a motion to dismiss.**

Under controlling Federal Circuit law, SAP cannot meet its burden at the pleading stage to overcome the specifications' recited improvements and Corent's related allegations. The "question" of "[w]hether the claim elements or the claimed combination are well-understood, routine, conventional is a question of fact" that "**cannot** be answered adversely to the patentee" where there are "concrete allegations regarding the claimed combination's improvement to the functioning of the computer." *Aatrix*, 882 F.3d at 1128 (emphasis added). The specifications' discussions of those benefits only reinforces that conclusion. *See, e.g.*, *Berkheimer*, 881 F.3d at 1370 (reversing ineligibility finding at step two where the "claims recite a specific method of archiving that, according to the specification, provides benefits that improve computer functionality"); *see also Cooperative Ent., Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 131-33 (Fed. Cir. 2022); *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1318 (Fed. Cir. 2019).

Ultimately, "[t]he burden of proof to invalidate [Corent's] patent claims is a heavy one—clear and convincing evidence—and it is a burden that rests squarely on" SAP. *Mosaic Brands, Inc. v. Ridge Wallet LLC*, 55 F.4th 1354, 1366 (Fed. Cir. 2022). SAP falls far short of "clear[ing] this high bar." *Id*. Instead, SAP focuses on individual components in isolation while ignoring the claimed arrangements. Mot. 19-20. That is not how step two works; the proper inquiry focuses on the ordered combination, not the components viewed separately. *See TecSec*, 978 F.3d at 1297. SAP identifies no prior system that employs the claimed architectures, much less clearly and convincingly shows that such arrangements were routine. Whether they were conventional is a factual issue inappropriate for resolution on a Rule 12(b)(6) motion.

**<u>CONCLUSION</u>**

SAP's motion should be denied.

Dated: July 20, 2026

Respectfully submitted,

*/s/ Matthew G. Berkowitz*

David M. Stein (Bar No. 198256)
dstein@olsonstein.com
Nancy M. Olson (Bar No. 260303)
nolson@olsonstein.com
OLSON STEIN LLP
240 Nice Lane, Suite 301
Newport Beach, CA 92663
Tel: (949) 887-4600

Matthew G. Berkowitz (Bar No. 310426)
mberkowitz@reichmanjorgensen.com
Patrick Colsher (Bar No. 336958)
pcolsher@reichmanjorgensen.com
Jeff Leung (Bar No. 310960)
jleung@reichmanjorgensen.com
Timothy A. Trost (Bar No. 340843)
ttrost@reichmanjorgensen.com
Alexander A. Williams (Bar No. 362748)
awilliams@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Tel: (650) 623-1401

David King (*pro hac vice*)
dking@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
1909 K Street, NW, Suite 800
Washington, DC 20006
Tel: (202) 894-7310

*Attorneys for Defendant and Counterclaim Plaintiff Corent Technology, Inc.*

## L.R. 11-6.2 CERTIFICATION

The undersigned, counsel of record for Defendant and Counterclaim Plaintiff Corent Technology, Inc., certifies that this brief contains 6,715 words, which complies with the word limit of L.R. 11-6.1.

By: */s/ Matthew G. Berkowitz*