UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:26-cv-00237-JVS-DFM | Date | October 6, 2026 |
| Title | SAP America, Inc. v. Corent Technology, Inc. | | |

| | |
|---|---|
| Present: The Honorable | **James V. Selna, U.S. District Court Judge** |

| | |
|---|---|
| Elsa Vargas | Not Present |
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** **[IN CHAMBERS] Order Regarding SAP America, Inc.'s Motion to Dismiss Counterclaims [59]**

Before the Court is Plaintiffs and Counterclaim Defendants SAP America, Inc.'s and SAP SE's (collectively, "SAP") Motion to Dismiss Corent Technology, Inc.'s ("Corent") Counterclaims for lack of patentable subject matter under 35 U.S.C. § 101. (Mot., Dkt. No. 59.) Corent opposed. (Opp'n, Dkt. No. 60.) SAP replied. (Reply, Dkt. No. 63.)

For the following reasons, the Court **GRANTS** the motion.

## I. BACKGROUND

### *A. Asserted Patents*

#### 1. The '372, '591, and '876 Patents

U.S. Patent Nos. 9,495,372 ("the '372 Patent"), 10,824,591 ("the '591 Patent") and 8,326,876 ("the '876 Patent") issued on November 15, 2016, November 3, 2020, and December 4, 2012 respectively. (Dkt. No. 57-3 ("'372 Patent"), (45); Dkt. No. 59-6 ("'591 Patent"), (45); Dkt. No. 57-5 ("'876 Patent"), (45)).) The '372 and '876 Patents are both titled "Multi-tenant agile database connector," and the '591 Patent is titled "Automatic transformation of single-tenant software applications to multi-tenant SaaS systems." ('372 Patent, (54); '591 Patent, (54); '876 Patent, (54).) The parties do not dispute Claim 1 of the '372 Patent is representative of all claims of the '372, '591, and '876 Patents. (Mot. at 20–21; Reply at 16; see Opp'n.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No. 8:26-cv-00237-JVS-DFM Date October 6, 2026

Title SAP America, Inc. v. Corent Technology, Inc.

Figure 1 of the ’372 Patent illustrates the conventional single-tenant or “non-tenant aware” architecture:




Figure 1A
(prior art)

Figure 1B
(prior art)

(’372 Patent, Figure 1.) In prior art systems, the software application instance [110] communicates with the database connector [120] “via non-tenant-specific commands.” (Id., 6:58–7:8.) The database connector executes the non-tenant-specific data access commands on the data repository [130]. (Id.) The conventional architecture made it cumbersome to convert single-tenant applications for use in a multi-tenant system, and required a “great deal of time and effort from each programmer” to “customize” and “specifically configure[]” each application “to be tenant-aware[.]” (Id., 1:34–59.)

The claimed invention in the ’372 Patent arose from the “need for improved methods of transforming a single-tenant application to have multi-tenant capability without significantly altering the original single-tenant architecture.” (Id., 2:30–33.) The ’372 Patent teaches a system that “allows a user to install an application designed for single tenant-use onto a multi-tenant system to be used by multiple tenants without needing to share data between tenants or to programmatically alter the application to be used with the system.” (Id., 3:24–28.) Figure 2 illustrates the disclosed system:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No. 8:26-cv-00237-JVS-DFM Date October 6, 2026

Title SAP America, Inc. v. Corent Technology, Inc.



**Figure 2**

(Id., Figure 2.) Unlike the prior art, the claimed invention contains an agile database connector [220] that is situated between the application instance [210] and the database connector [230]. (Id., 7:9–29.) The agile database connector is "configured to adapt to data access commands from an application that does not include any tenant-specific information by translating non-tenant-specific data access commands into tenant-specific data access commands." (Id., 7:9–29.) To execute the translation, the agile database connector uses "a unique identifier associated with the data access command to infer [...] the appropriate tenant associated with the data access command." (Id., 7:31–33.) Claim 1 of the '372 Patent claims:

> 1. A computer processor implemented system that facilitates concurrent, multi-session use of a non-tenant aware application by first and second tenants to access at least a first non-tenant aware data repository, utilizing unique tenant identifiers obtained from a tenant-aware non-application source, without requiring modification of the non-tenant aware application or the first non-tenant aware data repository, comprising:

an agile database connector configured to infer unique tenant identifiers from the tenant-aware non-application source, where the agile database connector has:

a translator logically disposed between (a) the first non-tenant aware data repository and (b) the application, and configured to translate at least first and second non-tenant specific data access commands received from the application into first and second tenant-specific data access commands, respectively, using the inferred unique tenant identifiers; and

a handler separate from the non-application source, the handler logically disposed between (a) the first non-tenant aware data repository and (b) the application, and configured to pass the first and second tenant-specific data access commands to the first data repository, respectively;

wherein first and second tenant-specific outputs from the first non-tenant aware data repository are forwarded to the application without passing back through the translator and handler, and

wherein the tenant-aware non-application source is external to the non-tenant aware application and the non-tenant aware data repository.

('372 Patent, claim 1.)

2. The '893 and '136 Patents

U.S. Patent Nos. 10,320,893 ("the '893 Patent") and 11,019,136 ("the '136 Patent") issued on June 11, 2019 and May 25, 2021 respectively. (Dkt. No. 57-2 ("'893 Patent"), (45); Dkt. No. 57-1 ("'136 Patent"), (45).) The '893 and '136 Patents are both titled "Partitioning and mapping workloads for scalable SaaS applications on cloud," and share a specification. ('893 Patent, (54); '136 Patent, (54).) The parties do not dispute Claim 1 of the '136 Patent is representative of all claims of the '136 and '893 Patent. (Mot. at 13–14; Reply at 16; see Opp'n.)

At the time the '136 Patent was filed, there was a push to migrate previously localized systems into the cloud. ('136 Patent, 1:35–39.) However, many applications were not well suited to the cloud. (Id., 1:45.) First, "cloud environments and their resources are available in a wide variety of configurations and may not pair well with the

application's requirements." (Id., 1:45–49.) Second, "legacy applications may fail to take advantage of additional resources offered by a cloud environment and/or [...] run inefficiently in a cloud." (Id., 1:49–51.)

The claimed invention in the '136 Patent arose from the "need for systems and methods that efficiently adapt legacy software applications so they may take advantage of the resources and benefits of a cloud environment." (Id., 1:60–64.) The '136 Patent teaches a system that leverages logical partitioning to "match and compare" a local application's "hardware, software, network, and other application environment resources" with those available in the cloud. (Id., 1:51–56.) "[G]rouping modules together by partition group before migrating the modules to cloud instances" allows "modules that share resources [to] be placed in closer logical proximity to one another in the cloud to optimize performance." ('136 Patent, abstract.) Claim 1 of the '136 Patent claims:

> 1. A method for configuring workloads, comprising:
> identifying workloads of a non-tenant-aware application and a set of application characteristics for each of the identified workloads;
> creating a partition of the workloads in reference to a partition application characteristic;
> grouping the created partition of the workloads into a plurality of workload sub-partitions as a function of a common workload characteristic;
> assigning each partition of the workloads to a set of cloud resources as a function of the partition application characteristic and a characteristic of the set of cloud resources;
> constructing a plurality of workload assignment maps to assign to each of the workloads in accordance with the created partition, and
> ranking each one of plurality of workload assignment maps based on a set of rules.

('136 Patent, claim 1.)

3. The '761 Patent

U.S. Patent No. 10,305,761 ("the '761 Patent") issued on May 28, 2019 and is titled "Multi-Application SaaS Metering Engine." (Dkt. No. 57-4 ("'761 Patent"), (45); id., (54).) The parties do not dispute Claim 1 of the '761 Patent is representatives of all claims of the '761 Patent. (Mot. at 8–9; Reply at 16; see Opp'n.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:26-cv-00237-JVS-DFM | Date | October 6, 2026 |
| Title | SAP America, Inc. v. Corent Technology, Inc. | | |

Similar to the ’136 Patent, at the time the ’761 Patent was filed, there was a push to migrate one or more aspects of previously localized systems into the cloud. (’761 Patent, 1:25–29.) When “one or more software applications are available for operation in one or more cloud environments, it is desirable to measure and/or meter each user’s use of any applications, and each application’s use of cloud resources.” (Id., 3:56–59.)

The claimed invention in the ’761 Patent arose out of the need “to monitor and/or monetize user’s [*sic*] consumption of cloud resources and/or SaaS services.” (Id., 1:57–58.) The claimed invention is “[a] system for measuring a usage event of at least one computer resource within a multi-tenant system.” (Id., claim 1.) Claim 1 of the ’761 Patent claims:

> 1. A system for measuring a usage event of at least one computer resource within a multi-tenant system, comprising:
> a metering engine configured to monitor a plurality of data streams generated by monitored events of the multi-tenant system;
> an identity engine configured to identify a first user who initiated an event captured by a portion of the plurality of data streams from a group of users as first user instances uniquely mapped to the first user;
> a bucket aggregator configured to aggregate activity from the first user instances to create a total activity aggregate of the first user comprising monitored events;
> a subscription engine configured to generate a summary of the total activity aggregate of the first user and a total activity aggregate of all instances that belong to a same zone as the first user;
> a rendering engine that presents a representation of the generated summary of the total activity aggregate of the first user and the total activity aggregate of all instances that belong to a same zone as the first user to a user interface;
> wherein the metering engine, the identity engine, the bucket aggregator, the subscription engine, and the rendering engine comprise stored program instructions embedded in a non-transitory computer readable storage medium, and
> wherein the stored program instructions are executed by a computer processor to execute a function.

(Id.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:26-cv-00237-JVS-DFM | Date | October 6, 2026 |
| Title | SAP America, Inc. v. Corent Technology, Inc. | | |

*B. Procedural History*

SAP sued Corent in the Central District of California, seeking declaratory relief.[1] (Compl., Dkt. No. 1.) Specifically, SAP alleges Corent accused SAP of infringing the ’876, ’372, ’591, ’893, ’136, and ’761 Patents (collectively, the “Asserted Patents”). (Id. ¶¶ 1, 3, 7.) SAP alleges Corent notified SAP that SAP’s products and services infringed the Asserted Patents and demanded a parent license. (Id. ¶¶ 2, 7.) SAP seeks a declaration that SAP’s accused products do not infringe, and have not infringed, the Asserted Patents directly or indirectly. (Id. ¶ 3.) Corent filed an answer to SAP’s complaint, and asserted counterclaims for infringement of the Asserted Patents. (Dkt. No. 40.) SAP now moves to dismiss Corent’s counter claims. (Mot.)

## II. Legal Standard

“Eligibility under 35 U.S.C. § 101 is a question of law, based on underlying facts.” SAP Am., Inc. v. InvestPic, LLC, 898 F.3d 1161, 1166 (Fed. Cir. 2018) (citations omitted). “Like other legal questions based on underlying facts, this question may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion where the undisputed facts, considered under the standards required by that Rule, require a holding of ineligibility under the substantive standards of law.” Id. (citations omitted). Patent eligibility can be determined at the 12(b)(6) stage “when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law.” Aatrix Software, Inc. v. Green Shades Software, Inc., 882 F.3d 1121, 1125 (Fed. Cir. 2018). In analyzing patent eligibility under Section 101, courts consider the claim as a whole, read in light of the specification. Packet Intel. LLC v. NetScout Sys., Inc., 965 F.3d 1299, 1309 (Fed. Cir. 2020) (citing Diamond v. Diehr, 450 U.S. 175, 188 (1981); Data Engine Techs. LLC v. Google LLC, 906 F.3d 999, 1011 (Fed. Cir. 2018)).

Under 35 U.S.C. § 101, an invention is patent-eligible if it claims a “new and useful process, machine, manufacture, or composition of matter.” However,

[1] Corent also sued Microsoft Corporation in the Central District of California, and the parties settled before a motion to dismiss was filed. Order Dismissing Case Upon Notice of Settlement, Corent Technology Inc. v. Microsoft Corporation, No. 8:25-cv-02182-DOC-DFM (C.D. Cal. 2025), Dkt. No. 18. Corent has also initiated a lawsuit against Amazon Web Services before the Court. Corent Technology Inc. v. Amazon Web Services, Inc., No. 8:26-cv-00194-JVS-DFM (C.D. Cal. 2026).

§ 101 has a longstanding, "important implicit exception: [l]aws of nature, natural phenomena, and abstract ideas are not patentable." Assoc. for Molecular Pathology v. Myriad Genetics, Inc., 569 U.S. 576, 589 (2013) (quoting Mayo Collaborative Servs. v. Prometheus Labs.,Inc., 566 U.S. 66, 70 (2012)). "[A]n invention is not rendered ineligible for patent simply because it involves an abstract concept," but only applications of an abstract concept "to a new and useful end" remain eligible for patent protection. Alice Corp. Pty. Ltd. v. CLS Bank Int'l, 573 U.S. 208, 217 (2014).

The U.S. Supreme Court has set forth a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent eligible applications of those concepts." Id. First, the Court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." Id. If so, then the second step requires the Court to search for an "inventive concept" by considering the elements of each claim—both individually and as an ordered combination—"to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." Id. If the claims at issue are directed to a patent-ineligible concept and the elements of each claim do not transform it into a patent-eligible application, then the claims are patent-ineligible under 35 U.S.C. § 101. See id. at 208, 217.[2]

## III. Discussion

### A. *Alice Step One*

Under step one of the Alice analysis, courts must consider whether a patent claim's "character as a whole" is "directed to" excluded subject matter, such as an abstract idea. See Internet Patents Corp. v. Active Network, Inc., 790 F.3d 1343, 1346 (Fed. Cir. 2015). "This inquiry has two parts. First, the Court identifies precisely what the claims are directed to accomplish. Second, the Court determines whether that 'focus' is an abstract idea." LaVoult.com, LLC v. Meta Platforms, Inc., 777 F. Supp. 3d 1072, 1077 (N.D. Cal. 2025)

[2] For the remainder of this Order, this two-step analysis will be referred to as the "Alice analysis."

1. What Are the Claims Directed To

Courts look to "'the focus of the claimed advance over the prior art' to determine if the character of the claim as a whole, considered in the light of the specification, is directed to excluded subject matter." Trading Techs. Int'l, Inc. v. IBG LLC, 921 F.3d 1084, 1092 (Fed. Cir. 2019) (quoting Intell. Ventures I LLC v. Cap. One Fin. Corp., 850 F.3d 1332, 1338 (Fed. Cir. 2017)). "Finding a claim's focus requires a delicate balancing act." LaVoult.com, 777 F. Supp. 3d at 1078 (quotations omitted). Courts must "articulate what the claims are directed to with enough specificity to ensure the step one inquiry is meaningful." Thales Visionix Inc. v. United States, 850 F.3d 1343, 1347 (Fed. Cir. 2017).

**a. The '372, '591, and '876 Patents**

Claim 1 of the '372 Patent is directed to using a non-application-based interface to configure a non-tenant aware application to have multi-tenant capability.[3] Looking first to the language of Claim 1, the preamble claims a system that "facilitates concurrent, multi-session use of a non-tenant aware application [...] without requiring modification of the non-tenant aware application or the first non-tenant aware data repository." ('372 Patent, claim 1.) Claim 1 contains a single element: the "agile database connector." ('372 Patent, claim 1.) The "agile database connector" is "configured to infer unique tenant identifiers from the tenant-aware non-application source." (Id.)

The agile database connector has two components: the translator and the handler. (Id.) The translator is "configured to translate [...] data access commands received from the application into [...] tenant-specific data access command [...] using the inferred unique identifiers." (Id.) Corent does not identify intrinsic evidence explaining how the translator translates the data access commands from the non-tenant aware application into tenant-specific commands other than that the translator "uses the inferred unique

[3]At the hearing, Corent took issue with the Court's characterization of the agile database connector as just "an interface." The Court notes that the Summary of the Invention describes the invention as a system that configures a "non-tenant-aware application [...] to have multi-tenant capapbility by providing a tenant-aware *interface module*." ('372 Patent, 2:38–40 (emphasis added).) The Court used the specification of the '372 Patent as its basis for describing the agile database connector as "an interface." (See id.)

identifiers." (Id.) The handler is "configured to pass the [...] tenant-specific data access commands to the [...] data repository." (Id.) Again, Corent does not identify intrinsic evidence that explains how the handler passes the tenant-specific data access commands to the data repository. The elements of Claim 1 of the '372 Patent are all defined by results, suggesting the claims are directed to a result and not a specific software architecture for achieving that result. Read as a whole, Claim 1 is directed to configuring a non-tenant aware application to have multi-tenant capability using an non-application-based interface.

The Court's reading of Claim 1 is confirmed by the specification. The invention arose out of "a need for improved methods of transforming a single-tenant application to have multi-tenant capability without significantly altering the original single-tenant application architecture." ('372 Patent, 2:30–33.) In describing prior art systems, the specification notes that configuring applications to have multi-tenant capability "require[d] a great deal of time and effort from each programmer" and required each application "to be specifically configured to be tenant-aware[.]" (Id., 1:32–38; id., 1:56–59.) The claimed invention's advance over prior art is its ability to configure a non-tenant aware application "to have multi-tenant capability by providing a tenant-aware interface module between the non-tenant aware application and a multi-tenant data repository." (Id., 2:36–41.) The focus is the agile database connector's ability to configure a non-tenant aware application to have multi-tenant capacity "without needing to be programmed to know any tenant information at all." (See id. 2:36–47.)

SAP contends Claim 1 of the '372 Patent is directed to using identifiers to translate data requests. (Mot. at 14.) As explained above, Claim 1, read in light of the specification is directed to configuring a non-tenant aware application to have multi-tenant capability using a non-application-based interface—i.e., the agile database connector. SAP's characterization has "a high level of abstraction, divorced from the claim language." Contour IP Holding LLC v. GoPro, Inc., 113 F.4th 1373, 1379 (Fed. Cir. 2024).

Corent counters Claim 1 of the '372 Patent is directed to a specific software architecture: the agile database connector, which is positioned between the application and the database. (See Opp'n at 14.) At the hearing, Corent elaborated that Claim 1 of the '372 Patent is directed to an architecture because unlike the prior art, the agile database connector moves multi-tenant handling functionality outside of the non-tenant

aware application. Although Claim 1 requires the multi-tenant handling functionality to occur between the application and the multi-tenant data repository, Corent does not identify intrinsic evidence explaining how the claimed invention "translates" data access requests using unique identifiers and "passes" the data access requests to the data repositor.

Accordingly, Claim 1 of the '372 Patent is directed to using a non-application-based interface to configure a non-tenant aware application to have multi-tenant capability.

**b. The '893 and '136 Patents**

Claim 1 of the '136 Patent is directed to grouping non-tenant aware application workloads into partition groups and assigning the partition groups to cloud resources based on characteristics. Looking first to the claim language, the preamble begins by claiming "[a] method for configuring workloads." ('136 Patent, claim 1.) There are six claim limitations. (Id.) First, the method identifies workloads of a non-tenant aware application and characteristics for each workload. (See id.) Second, the method creates a partition of the workloads in reference to a partition application characteristic. (See id.) Third, the method groups the partition of workloads into workload sub-partitions as a function of a common workload characteristic. (See id.) Fourth, the method assigns each partition to a set of cloud resources as a function of the partition application characteristic and a characteristic of a set of cloud resources. (See id.) Fifth, the method constructs workload assignment maps to assign to each of the workloads in accordance with the created partition. (See id.) And sixth, the method ranks the workload assignment maps based on a set of rules. (See id.) All of the claim elements are defined by a result, without explaining how the result is achieved.

The Court's reading of Claim 1 of the '136 Patent is confirmed by the specification. The invention arose out of a "need to adapt legacy software applications so they may take advantage of the resources and benefits of a cloud environment." ('136 Patent, 1:60–63.) Particularly, there was a need "to effectively consider factors such as cost, scalability, performance, and security inherent in the use of cloud resources before the software application can be deployed on the could." (Id., 1:66–2:2.) In describing prior art systems, the specification notes "it is helpful to match and compare a local software application's hardware, software, network, and other application environment

resources with the resources of any cloud environments considered for migration." (Id., 1:52–56.) "The matching and comparing reveals compatibility, costs, and other software migration factors that can serve as a basis for the selection of a proper cloud environment or environments." (Id., 1:56–59.) The claimed invention's advance over prior art is the ability to "assign[] each workload arrangement to an appropriately matched computer resource in the cloud" based on the "characteristics of the software application" and the "characteristics of cloud environments and cloud resources available in the cloud environment." (Id., 2:11–39.)

Corent counters that the '893 and '136 Patents are directed to improved computer architecture consisting of scanning, partitioning, mapping, and rendering engines—each governed by rule databases. (Opp'n at 15–16.) However, Claim 1 of the '136 Patent has no structural limitations whatsoever. (See '136 Patent, claim 1.) As explained above, each claim element is defined by a result and not by a structure. The elements of Claim 1 are not, as Corent contends, "a structured arrangement of components"; they are steps in a process with no architectural limitations. (See Mot at 16; '136 Patent, claim 1.)

In conclusion, Claim 1 of the '136 Patent is directed to grouping non-tenant aware application workloads into partition groups and assigning the partition groups to cloud resources based on characteristics.

### c. The '761 Patent

Claim 1 of the '761 Patent is directed to monitoring and aggregating a user's activity in a multi-tenant system. Looking first to the claim language, the preamble begins by stating the claimed invention is "a system for measuring usage [...] within a multi-tenant system." ('761 Patent, claim 1.) The claim limitations all cover different "engines" and "a bucket aggregator" that are defined by a result. The "metering engine [...] monitor[s] a plurality of data streams." (Id.) The "identity engine [...] identif[ies] a first user who initiated an event." (Id.) The "bucket aggregator [...] aggregate[s] activity from the first user instances to create a total activity aggregate of the first user." (Id.) The "subscription engine [...] generate[s] a summary of the total activity." (Id.) And the "rendering engine [...] presents a representation of the generated summary of the total activity aggregate." (Id.)

The specification confirms the Court's reading of Claim 1 of the '761 Patent. The claimed invention addresses the "time and cost" of cloud migrations and fulfilled the need "to monitor and/or monetize user's [*sic*] consumption of cloud resources and/or SaaS services." (Id., 1:33–58.) "Of particular interest are systems and methods that measure aspects of user's [*sic*] data streams" that enables users to be "billed for actual use of the cloud resources, as opposed to block usage." (Id., 2:49–53.) The specification also contemplates "systems and methods that throttle user's [*sic*] access to cloud resources as a function of some circumstance," "an identity database configured to store identity information," "a billing engine," and "a notification system providing notifications to cloud operating personnel and/or users regarding status and use of cloud resources." (Id., 2:49–3:6.) The contemplated embodiments all involve measurement and aggregation of a user's cloud activity. Corent contends that the '761 Patent is directed to improving a cloud computing's system's performance, including the ability to efficiently assign available resources. (Opp'n at 17.) But the specification illustrates that improving performance and assigning resources is just one embodiment of the invention. Other embodiments involve billing, notifying users of cloud usage, and an identity database. ('761 Patent, 2:49–3:6.)

In conclusion, Claim 1 of the '761 Patent is directed to monitoring and aggregating a user's activity in a multi-tenant system.

2. Are the Claims Directed To an Abstract Idea

A court needs to avoid oversimplifying a patent's claims because, to a certain extent, all inventions are built from abstract ideas. Mayo Collaborative Servs. v. Prometheus Labs.,Inc., 132 S. Ct. 1289, 1293 (2012). However, the concept of an abstract idea does not have a clear definition, so a court needs to compare the claim at issue with claims in previous cases. See OIP Techs., Inc. v. Amazon.com, Inc., 788 F.3d 1359, 1362 (Fed. Cir. 2015).

In the context of computer software patents, the Federal Circuit provides several guiding principles. First, a software patent is not directed to an abstract idea when it makes "non-abstract improvements to computer technology." Enfish, LLC v. Microsoft Corp., 822 F.3d 1335 (Fed. Cir. 2016); see also id. at 1339 (finding claims covering a self-referential table were not directed to an abstract idea because the self-referential table was "designed to improve the way a computer stores and retrieves data in memory"). But

a software patent is directed to an abstract idea if it is directed to a process that can be "performed in the human mind, or by a human using pen and paper." Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd., 955 F.3d 1317, 1327 (Fed. Cir. 2020) (citing CyberSource Corp. v. Retail Decisions, Inc., 654 F.3d 1366, 1372 (Fed. Cir. 2011)).

Second, a software patent is directed to an abstract idea when it is directed to a desired result without any limitation on how to produce that result. Interval Licensing LLC v. AOL, Inc., 896 F.3d 1335, 1345 (Fed. Cir. 2018); see also id. at 1344 (noting software-based inventions fail to pass the Section 101 muster if "the elements of the asserted invention [are] so result-based that they amount[] to patenting the patent-ineligible concept itself") (citing Elec. Power Grp., LLC v. Alstom S.A., 830 F.3d 1350, 1354–1355 (Fed. Cir. 2016)). For example, consider a CEO who announces to her engineers that her goal is to produce an electric car that can be driven 1,000 miles without needing to be recharged. Am. Axle & Mfg., Inc. v. Neapco Holdings LLC, 966 F.3d 1347, 1357 (Fed. Cir. 2020) (Chen, J., concurring). The CEO's announcement is not an invention under Section 101 because she only came up with the idea, without "any arguable act of invention to reach the claimed result." See id. Claims are directed to an abstract idea when they claim a functional result without sufficiently describing how to achieve the result in a non-abstract way. Two-Way Media Ltd. v. Comcast Cable Communications, LLC, 874 F.3d 1329, 1337 (Fed. Cir. 2017). To be non-abstract, claims must provide specificity as to how the functional result is achieved. See GoTV Streaming, LLC v. Netflix, Inc., 166 F.4th 1053, 1068 (Fed. Cir. 2026).

**a. The '372, '591, and '876 Patents**

As explained in Section III.A.1.a supra, Claim 1 of the '372 Patent is directed to using a non-application-based interface to configure a non-tenant aware application to have multi-tenant capability. Claim 1 of the '372 Patent is directed to an abstract idea.

*i. No Concrete Improvement to a Computer System*

Claim 1 of the '372 Patent is directed to an abstract idea because it is not directed to an improvement in the computer system itself. The claimed invention sought to eliminate the need to manually to "customize" or "specifically configure" each non-tenant aware application to be tenant-aware, which required "a great deal of time and effort from each programmer." ('372 Patent, 1:34–59.) The invention's advance over the

prior art was the "interface module" could "handle[] non-tenant-specific data access commands [...] without needing to be programmed[.]" (Id., 2:42–47.) Corent itself points out that the agile database connector provides the "ability to easily and quickly install a non-tenant aware application into a multi-tenant database." (Opp'n at 15 (quoting '374 Patent, 6:17–23). "[I]t is not enough [...] to merely improve a fundamental practice or abstract process by invoking a computer merely as a tool." Customedia Techs., LLC v. Dish Network Corp., 951 F.3d 1359, 1364 (Fed. Cir. 2020). The invention invokes the agile database connector as a tool to configure non-tenant-specific applications to multi-tenant environments. (See '372 Patent, 2:42–47.) See Customedia, 951 F.3d at 1364.

At the hearing, Corent argued prior art systems required programmers to "rewrite" non-tenant aware applications for multi-tenant use. But Corent does not identify intrinsic evidence indicating that a non-tenant aware application is improved—for example, by running more efficiently—when it is configured by the agile database handler as opposed to configured manually by a programmer. Claim 1 of the '372 Patent recites an improvement—and perhaps a significant one—to programming methodology, but not an improvement to computer functionality. Cf. Cusotmedia, 951 F.3d at 1365 ("improving a user's experience while using a computer application is not, without more, sufficient to render the claims directed to an improvement in computer functionality").

Corent argues Claim 1 of the '372 Patent is directed to specific improvements in system performance by "prevent[ing] gridlock in underlying database facilities." (Opp'n at 15 (quoting '372 Patent, 9:7–19).) But specification indicates preventing gridlock is a feature of "an alternative embodiment." ('372 Patent, 9:7.) Corent does not explain how an effect on database gridlock in one alternative embodiment of the invention demonstrates the claims are directed to non-abstract improvements in a computer system. As explained above, the intrinsic evidence indicates the claims are directed to allow for automatic configuration of non-tenant aware applications to multi-tenant environments, so that programmers do not have to go through the arduous process of configuring them manually.

*ii. Results-Based Claims*

Claim 1 of the '372 Patent is directed to an abstract idea because although the claims restrict the logical disposition of the claim elements, those elements are described

with results-based language. For example, the agile database connector is defined by a translator that "translate[s] [...] non-tenant specific data access commands received from the application into [...] tenant-specific data access commands [...] using the inferred unique tenant identifiers." (See id.) But there is no specificity regarding how the translation occurs, other than the translator uses the unique identifiers. And "[t]he use of a unique identifier does not prevent a claim from being directed to an abstract idea." Trinity Info Media, LLC v. Covalent, Inc., 72 F.4th 1355, 1364 (Fed. Cir. 2023). The second element of the agile database connector, the handler, passes the "tenant-specific data access commands to the first data repository." (See id.) But provides no specificity regarding how those commands are passed. The Claim 1 of the '372 Patent is "so results-based that [it] amount[s] to patenting the patent-ineligible concept" of translating and handling non-tenant aware data access commands for a tenant-aware environment. See Interval Licensing, 896 F.3d at 1344; see also GoTV, 166 F.4th at 1064 (when a claim contains result-focused and functionally described computer processes, there must be specificity as to how the function is carried out).

Corent argues the claim language limiting the logical disposition of the translator and handler renders Claim 1 of the '372 Patent non-abstract. (Opp'n at 14.) Corent reiterated its position at the hearing, arguing agile database connector's location outside of the application renders Claim 1 of the '372 Patent non-abstract. The Court disagrees. In T-Jat Sys. 2006, Ltd. v. Expedia, Inc. (DE), the claims at issue required transmitting a request from a telephone device to an internet-based application through a virtual client entity. No. CV 16-581-RGA, 2018 WL 1525496, at *3 (D. Del. Mar. 28, 2018). The positional limitation of the virtual client entity between the telephone device and the internet-based application did not render the claims non-abstract. Id., at *4. The virtual client entity was "nothing more than a 'black box'" because it provided "no details about *how* the claimed invention was achieved." Id., at *4 (internal quotations omitted) (emphasis in original). Claim 1 of the '372 Patent is similar because it provides no detail about how the multi-tenant handling occurs; it only limits where the multi-tenant handling occurs and requires the use of a unique identifier. ('372 Patent, claim 1.) And second, like T-Jat, the logical disposition of the translator and handler between the application and the non-tenant aware data repository is inherent to the concept using a non-application-based interface to configure a non-tenant aware application for multi-tenant environments. See T-Jat, 2018 WL 1525496, at *4. A non-application-based interface must be located between the application and

data repository to translate non-tenant specific data access commands into tenant-specific data access commands.

Corent also argues Claim 1 of the '372 Patent is not directed to an abstract idea under Ollnova Technologies Ltd. v. ecobee Technologies ULC, 177 F.4th 1343 (Fed. Cir. 2026). In Ollnova, the panel held the claims were not abstract because they recited "a particular technique governing *when* and *how* information is transmitted within a network using a wireless automation device." Id. at 1360 (emphasis in original). The claim imposed timing constraints: "during a current period of the polling interval" and "during a period of a transmission interval." Id. And the claim imposed a conditional transmission trigger: "in response to detecting a change in the sensed condition outside a predetermined range." Id. These limitations together contributed to reducing the controller's communications within the network. Id. The invention solved concrete technical problems, such as reducing unnecessary communications and conserving power by preventing routine or redundant transmissions. Id. The panel cautioned against "oversimplif[ying] the claims by ignoring their specific operational limitations, including timing constraints and conditional transmission." Id.

Claim 1 of the '372 Patent recites the following limitations: (1) the translator and handler must be logically disposed between the non-tenant aware data repository and the application; (2) outputs from the non-tenant aware data repository are forwarded to the application without passing back through the translator and handler; and (3) the tenant-aware non-application source is external to the non-tenant aware application and non-tenant aware data repository. ('372 Patent, claim 1.) The operational limitations in Claim 1 of the '372 Patent limit the logical positioning of computer program functionality within the computer system.

However, the constraints at issue in Ollnova are distinguishable. The Ollnova claims contained functionally defined elements, but the constraints required the functions to be performed at certain times or in response to a certain trigger defined in the claims. See Ollnova, 177 F.4th at 1360. The limitations shifted the focus of the claims away from the functionally-defined result because the time and trigger constraints explained how the result was achieved. See id. Here, in contrast, the constraints limit the logical disposition of the multi-tenant handling, but do not illuminate how the claimed invention achieves multi-tenant handling. See GoTV, 166 F.4th at 1064 (when a claim contains result-focused and functionally described

computer processes, there must be specificity as to how the function is carried out). Claim 1 of the '372 Patent limits *where*, but not "*when* or *how*," the result-focused computer processes are carried out. Moreover, in Ollnova, the specification describes concrete improvements to the computer system, such as reducing unnecessary communications and conserving power. See id. Given the lack of "how" in the claims, combined with the lack of a specific improvement to a computer system, Claim 1 of the '372 Patent does not pass the muster at Alice step one.

*****

In conclusion, Claim 1 of the '372 Patent is directed to the abstract idea of configuring a non-tenant aware application to multi-tenant environments using a non-application-based interface.

**b. The '893 and '136 Patents**

As explained in Section III.A.1.b supra, Claim 1 of the '136 Patent is directed to grouping non-tenant aware application workloads into partition groups and assigning the partition groups to cloud resources based on characteristics. Claim 1 of the '136 Patent is directed to an abstract idea.

First, the Court finds Broadcom Corp. v. Netflix Inc. persuasive. No. 3:20-CV-04677-JD, 2022 WL 3155410 (N.D. Cal. Aug. 8, 2022). The asserted patent in that case taught "using rule statements and user-defined parameters to identify the best computer devices in a system to perform the job and to make decisions about how to distribute resources for different jobs." Id., at *1. The court noted the claims were directed to "allocating resources and tasks across a system," which "is a quintessential abstract idea." Id. (citing Intell. Ventures, 838 F.3d at 1314). The patent owner's main argument against dismissal was that the claims were directed to an improvement in computer functionality. Id. But the court disagreed. Id. "Although the specification teaches that the system can improve operational efficiency, the patent [was] still directed to the abstract idea of allocating tasks across the system." Id. The patent owner did not identify any specific structures that performed and improved the operational efficiency of the system itself. Id., at *2. "[T]he efficiency that is gained from using the method of the [asserted] patent [came] from the fact that task management and allocation makes tasks more efficient." Id.

Similar to the asserted patent in Broadcom, the '136 Patent teaches using characteristics to identify the grouping of workloads and assigning them to appropriate cloud resources. (See '136 Patent, claim 1.) See Broadcom, 2022 WL 3155410, at *1. And "allocating resources and tasks across a system ... is a quintessential abstract idea." Broadcom, 2022 WL 3155410, at *1 (citing Intell. Ventures, 838 F.3d at 1314). Moreover, Corent, like the patent owner in Broadcom, contends Claim 1 of the '136 Patent is directed to an improvement in computer functionality. (Opp'n at 16.) See Broadcom, 2022 WL 3155410, at *1. Corent argues that the specification establishes the claimed invention improves system performance and flexibility.[4] (Opp'n at 16.) But like in Broadcom, the claims do not contain any specific structures performing and improving the operational efficiency of the system. See Broadcom, 2022 WL 3155410, at *2. Any "efficiency that is gained" from using the claimed invention comes "from the fact that task management and allocation makes tasks more efficient." (See Opp'n at 16 (arguing "the architecture enables" improvements to system efficiency and performance).) See Broadcom, 2022 WL 3155410, at *2. Claim 1 of the '136 Patent is not directed to a non-abstract improvement in a computer system.

Second, Claim 1 of the '136 Patent is defined only by results-based language. As explained in Section III.A.1.b supra, every limitation of Claim 1 of the '761 Patent is a step of a method described exclusively by a result. The language is "so results-based that [it] amount[s] to patenting the patent-ineligible concept[s]" of identifying workloads, creating a partition, grouping the partitions, assigning each partition to cloud resources, constructing workload assignment maps, and ranking the workload assignment maps. See Interval Licensing, 896 F.3d at 1344.

---

[4] Corent states the specification establishes that the claimed invention improves system performance and flexibility. (Opp'n at 16 (citing '893 Patent, 2:58–63; '136 Patent, 3:26–31; id., 3:51–67; id., 6:23–27; id., 7:48–51).) The Court is not convinced the cited portions of the specification support Corent's position. (See, e.g., Opp'n at 16 (arguing the specification states the claimed invention discloses "dependency-aware workload identification [that] enables compatible efficient execution") (citing '136 Patent, 3:62–67); '136 Patent, 3:62–67 ("The inventive subject matter further provides apparatus, systems, and methods in which an interface module scans the SaaS application to identify the different components and workloads of the software and analyzes its dependencies within the software and also on the environment in which the application is expected to run.").) The Court accepts Corent's representations for the sake of argument.

Third, Claim 1 of the '136 Patent is directed to a process that can be performed solely by the human mind. As explained above, Claim 1 of the '136 Patent is directed to identifying characteristics, grouping non-tenant aware application workloads, and assigning the partition groups to cloud resources accordingly. Identifying characteristics, grouping tasks together, and matching them to resources can be performed by the human mind. Cf. Ericsson, 955 F.3d at 1327 ("Controlling access to resources is exactly the sort of process that can be performed in the human mind, or by a human using a pen and paper, which we have repeatedly found unpatentable.") (quotations and citations omitted). This is "a telltale sign of abstraction." PersonalWeb, 8 F.4th at 1316. At the hearing, Corent disagreed, arguing dividing application workloads is not an activity that can be performed by the human mind. Even assuming that is true, Corent does not identify any intrinsic evidence explaining how the application workloads are divided. The claims recite "creating a partition of the workloads in reference to a partition application characteristic," but provide no specificity as to how the characteristic-based partitioning is achieved. See GoTV, 166 F.4th at 1068 (claims must provide specificity as to how a functional result is achieved).

In conclusion, Claim 1 of the '136 Patent is directed to the abstract idea of grouping non-tenant aware application workloads and matching them to cloud computing resources based on characteristics.

#### c. The '761 Patent

As explained in Section III.A.1.c supra, Claim 1 of the '761 Patent is directed to monitoring and aggregating a user's activity in a multi-tenant system. Claim 1 of the '761 Patent is directed to an abstract idea.

Claim 1 of the '761 Patent is directed to a process that can be performed solely by the human mind. As explained above, Claim 1 of the '761 Patent is directed to monitoring and aggregating a user's activity. Measuring and aggregating activity is "a purely arithmetic exercise" that can be performed solely in the human mind. Cf. Coffelt v. NVIDIA Corp., 680 F. App'x 1010, 1011 (Fed. Cir. 2017) (holding calculating and comparing regions in space is an abstract idea because it is "a purely arithmetic exercise"); see also SAP Am., Inc. v. InvestPic, LLC, 898 F.3d 1161, 1167 (Fed. Cir. 2018) (holding that "selecting certain information, analyzing it using

mathematical techniques, and reporting or displaying the results of the analysis" is an abstract idea). This is "a telltale sign of abstraction." PersonalWeb, 8 F.4th at 1316.

Claim 1 of the '761 Patent is not directed to improving the functioning of a computer system. The specification is clear that the purpose of the invention is "to monitor and/or monetize user's [*sic*] consumption of cloud resources and/or SaaS services." ('761 Patent, 1:57–58.) Claim 1 does not recite any impact to the computer system itself; it only recites that the claimed invention monitors a user's activity in a multi-tenant system. (Id., claim 1.) Corent contends the system "performs granular, instance-level monitoring, in which data stream are tracked, labeled, and associated with a specific tenant." (Opp'n at 17.) But the process Corent describes does not improve the computer system, it only measures and monitors it. Like in Broadcom, any "efficiency that is gained" from using the claimed invention comes from the fact that monitoring and measuring user activity can "make[] tasks more efficient." See Broadcom, 2022 WL 3155410, at *2.

Moreover, Claim 1 of the '761 Patent is defined only by results-based language. As explained in Section III.A.1.c supra, every limitation of Claim 1 of the '761 Patent has an "engine" or "bucket aggregator" defined exclusively by results. The language is "so results-based that [it] amount[s] to patenting the patent-ineligible concept[s]" of metering, identifying, aggregating, summarizing, and rendering. See Interval Licensing, 896 F.3d at 1344. At the hearing, Corent argued Claim 1 of the '761 Patent is eligible because "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." DDR Holdings, LLC v. Hotels.com, L.P., 773 F.3d 1245, 1257 (Fed. Cir. 2014). But in DDR Holdings, the panel cautioned that "not all claims purporting to address Internet-centric challenges are eligible for patent." Id. at 1258. The claims at issue in DDR Holdings "specifi[ied] *how* interactions with the Internet are manipulated to yield a desired result." Id. In contrast, Claim 1 of the '761 patent does not explain how the claimed invention meters, identifies, aggregates, summarizes, and renders. (See '761 Patent, claim 1.) See GoTV, 166 F.4th at 1068 (claims must provide specificity as to how a functional result is achieved).

In conclusion, Claim 1 of the '761 Patent is directed to the abstract idea of monitoring and measuring user activity in a multi-tenant environment.

*B. Alice Step Two*

At the second step of the Alice analysis, courts must examine the "elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." See Alice, 573 U.S. at 221. A court must look to the remaining elements aside from those directed to an abstract idea, either in isolation or combination with the other non-patent-ineligible elements. E.g., In re BRCA1– & BRCA2–Based Hereditary Cancer Test Patent Litig., 774 F.3d 755, 764 (Fed. Cir. 2014). However, this step does not replace the tests for validity—e.g., non-obviousness, utility, or novelty—because its only objective is to determine whether the claims attempt to solve a problem. See Versata Dev. Grp., Inc. v. SAP Am., Inc., 793 F.3d 1306, 1332 (Fed. Cir. 2015).

"[W]hether a claim recites patent eligible subject matter is a question of law," but it is one which may contain underlying factual determinations. Berkheimer v. HP Inc., 881 F.3d 1360, 1368 (Fed. Cir. 2018) (citations omitted). One such factual determination is "[w]hether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent." Id. at 1369. Thus, a complaint that properly alleges that individual elements of a claim are not well-understood, routine, or conventional, may be sufficient to state a claim notwithstanding an invalidity challenge under Section 101. Aatrix, 882 F.3d at 1128. But the allegations must be concrete. See id. "Conclusory allegations need not be credited as true at the motion-to-dismiss-stage, including allegations contradicted by the specification." RFC Lenders of Texas, LLC v. Smart Chem. Sols., LLC, No. 2025-1044, 2026 WL 1162746, at *3 (Fed. Cir. Apr. 29, 2026).

The Federal Circuit has provided guidance as to what constitutes an inventive concept in the "context of claims for computer implementations of abstract ideas." In re Killian, 45 F.4th 1373, 1382 (Fed. Cir. 2022). "[C]laims for methods that 'improve[ ] an existing technological process' include an inventive concept at step two." Id. (citing BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC, 827 F.3d 1341, 1350 (Fed. Cir. 2016)). "And claims that 'recite a specific, discrete implementation of the abstract idea' rather than 'preempt[ing] all ways of' achieving an abstract idea using a computer may include an inventive concept." Id. (citing BASCOM, 827 F.3d at 1350). A "technological solution to a technological problem" canf supply an inventive concept. See Amdocs (Israel) Ltd. v. Openet Telecom, Inc., 841 F.3d 1288,

1301 (Fed. Cir. 2016). "But claims to 'an abstract idea implemented on generic computer components, without providing a specific technical solution beyond simply using generic computer concepts in a conventional way' do not pass muster at step two." Id. (citing BASCOM, 827 F.3d at 1352). "Neither 'attempting to limit the use of [the idea] to a particular technological environment' nor a 'wholly generic computer implementation' is sufficient." buySAFE, Inc. v. Google, Inc., 765 F.3d 1350, 1354 (Fed. Cir. 2014) (quoting Alice, 573 U.S. at 222–23).

1. The '372, '591, and '876 Patents

Corent contends the following constitute inventive concepts: (1) an intermediate architectural block that operates between the application and the database using externally sourced tenant identifiers, (2) routing architectures in which outputs bypass transformation components, (3) conditional authorization mechanisms that determine whether translation occurs, and (4) concurrent data-access handling based on tenant identifiers. (Opp'n at 22.) In its brief, Corent does not identify the specific language in the claims or specification corresponding to these structures. (See id. (citing the '372, '876, and '591 patents generally).) The Court cannot assess whether these structures supply an inventive concept without knowing the corresponding claim language. See Move, Inc. v. Real Est. All. Ltd., 721 F. App'x 950, 957 (Fed. Cir. 2018) ("Where the claim language does not provide any specific showing of what is inventive about the limitation in question or about the technology used to generate and process it, we have concluded that the claims do not satisfy Alice's second step.") (cleaned up). And the Court declines to consider Corent's skeletal argument that the unique combination of these unidentified elements provides an inventive concept.

At the hearing, Corent argued that the novel software architecture of the agile database is an inventive concept, because it is "a technological solution to a technological problem." Amdocs, 841 F.3d at 1301. An unconventional software architecture can supply an inventive concept. See Amdocs, 841 F.3d at 1303. In Amdocs, the claims at issue were construed to contain a limitation that the "distributed" system required network usage to be performed close to the source. Id. This limitation was a critical advancement over the prior art. Id. Although the claim contained generic components, the limitation required the generic components to operate in an unconventional way. Id. The claim was tied to a specific structure of various components, including network devices, gatherers, ISMs, a central event

manager, a central database, a user interface server, and terminals or clients. Id. at 1301. Critically, the panel noted the unconventional arrangement of structures was a technological solution—enhancing data in a distributed fashion—to a technological problem—massive record flows which previously required massive databases. Id. The specification explained that the distributed architecture enabled load distribution, which reduced congestion in network bottlenecks while allowing the data to be accessible from a central location. Id. The panel concluded the claimed invention "purposefully arrange[d] the components in a distributed architecture to achieve a technological solution to a technological problem specific to computer networks." Id. at 1301.

In many ways, Claim 1 of the '372 Patent is similar to Amdocs. Prior art systems lacked a non-application-based interface module to configure non-tenant aware applications for multi-tenant systems. (See '372 Patent, 2:36–41.) So, software programmers had to manually configure the application to be tenant-aware. (See id. at 1:32–59.) Claim 1 of the '372 Patent requires the agile database connector to be logically disposed between the application and the database. ('372 Patent, claim 1.) This is similar to the positional limitation in Amdocs, which required network usage records to be processed close to their sources. Amdocs, 841 F.3d at 1300. And like Amdocs, the positional limitation was a critical advancement over the prior art. (See '372 Patent, 1:35–2:34 (explaining prior art systems required programmers to customize and manually configure non-tenant aware applications for multi-tenant use); id. at 2:36–47 (the inventive aspect of the '372 Patent is an interface module between the non-tenant aware application and a multi-tenant data repository that allows for multi-tenant functionality without programmatically altering the system); see also Opp'n at 4–5 (touting the invention's ability to "transform[] a single-tenant application to have multi-tenant capability without significantly altering the original single-tenant architecture" as the claimed advance).) See Amdocs, 841 F.3d at 1300.

But only Amdocs recites a tecchnological solution to a technological problem. In Amdocs, there was intrinsic evidence the distributed architecture enabled load distribution within a computer network. See id. Likewise, in Ollnova, the claimed architecture enabled coordinated control of building systems during networks failures. 177 F.4th at 1359. In DDR Holdings, the claimed invention provided a new way to display advertisements on a host website to retain users. 773 F.3d at 1257. In BASCOM, the claimed invention used internet service providers (ISPs) to identify

accounts and associate requests to the accounts. 827 F.3d at 1350. The claimed inventions in Amdocs, Ollnova, DDR Holdings, and BASCOM all solved problems within a computer system: load distribution, handling network failure, preventing a user from navigating away from a website, and identifying accounts to associate network requests. Those inventions all changed *how* the computer system operated compared to the prior art. Claim 1 of the '372 Patent, in contrast, changes *where* the multi-tenant handling occurs. And the goal is to eliminate the need for manual configuration by software programmers, which is a problem that is ultimately external to the computer system. (See Opp'n at 4–5 (explaining the claimed invention's advance over the prior art is that software engineers did not have to manually configure single-tenant applications for multi-tenant use.) Corent does not identify intrinsic evidence indicating a single-tenant application performs differently when it is configured by the agile database connector, as opposed to when it is configured manually by a programmer.[5] Therefore, the agile database connector is not a technical solution to a technical problem.

Corent argues that patent eligibility of a software process does not hinge on a connection to physical components. Corent is correct. See, e.g., DDR Holdings, 773 F.3d at 1258 (holding a web interface that displays an advertisement for a third-party product on a host website to avoid losing website visitors contained an inventive concept). But even for a claimed software process, the problem and solution must be rooted in computer technology. See id. at 1257; Amdocs, 841 F.3d at 1301. Here, the only problem Corent identifies is the amount of time and effort expended by programmers, resulting in "clunky" prior art systems. (See Opp'n at 4–5.) This problem, without more, is ultimately external to the computer system.

In conclusion, Claim 1 of the '372 Patent does not contain an inventive concept.

[5] Corent cites to language in the specification stating the claimed invention prevents gridlock in underlying database facilities. (Opp'n at 15 (quoting '372 Patent, 9:7–19).) Although database gridlock is a problem rooted in computer technology, the '372 Patent limited gridlock prevention to "an alternative embodiment." ('372 Patent, 9:7.)

2. The ’893, ’136, and ’761 Patents

SAP contends that Claim 1 of the ’136 Patent and Claim 1 of the ’761 Patent lack inventive concepts because (1) the claim limitations are all defined by results, and (2) the specification admits that the invention can be implemented using conventional computer technologies. (Mot. at 7, 3.) Claim 1 of the ’136 Patent and Claim 1 of the ’761 Patent contain results-oriented language, Section III.A.2.b–c supra, which does not suffice at Alice step two. GoTV, 166 F.4th at 1067 (holding it is not enough at Alice step two “for a claim to use functional, result-focused language”).

Moreover, the intrinsic evidence suggests the abstract ideas in Claim 1 of the ’136 Patent and Claim 1 of the ’761 Patent are carried out using conventional computer techniques. First, the claim language in the ’136 and ’761 Patents does not recite unconventional computer technology; it merely recites steps executed by a software program. (’136 Patent, claim 1; ’761 Patent, claim 1.) The elements of the claims are defined only by results-based language. Id. “[B]ecause the patent[s] fail[] to disclose how to achieve the end result, a skilled artisan must be able to use routine and conventional methods to do so.” Hawk Tech. Sys., LLC v. Castle Retail, LLC, 60 F.4th 1349, 1355 (Fed. Cir. 2023). The specifications of the ’136 and ’761 Patents also indicate that the claimed inventions can be carried out using conventional computer systems. (See ’136 Patent, 5:43–58 (“It should be noted that any language directed to a computer or a computer system should be read to include any suitable combination of computing devices, including servers, interfaces, systems, databases, agents, peers, engines, controllers, or other types of computing devices operating individually or collectively.”); ’761 Patent, 5:65–6:3 (same)) Claim 1 of the ’136 Patent and Claim 1 of the ’761 Patent, read as a whole in light of the specifications, indicate the claimed inventions can be implemented using conventional computer technology. At Alice step two, it is not enough for a claim “to encompass ordinary computers and networks to perform their ordinary functions in carrying out an abstract idea.” GoTV, 166 F.4th at 1067.

Corent contends the ordered combination of elements in Claim 1 of the ’136 Patent and Claim 1 of the ’761 Patent supply an inventive concept. (Opp’n at 23.) Corent’s skeletal arguments that “[t]hese ordered combinations deliver specific system improvements” and “this arrangement is not conventional [and] it changes how usage data is collected, attributed, and aggregated in shared environments” do not suffice.

See GoTV, 166 F.4th at 1068; see also Advanced Powder Sols., Inc. v. United States, 160 Fed. Cl. 575, 582 (2022) ("The mere citation of a case, statute, or regulation does not an argument make." ). The Court declines to "fill in logical and evidentiary gaps" on Corent's behalf. See Ahtna Logistics, LLC v. United States, 163 Fed. Cl. 488, 505 (2022) (citing United States v. Dunkel, 927 F.2d 955, 956 (Fed. Cir. 1991)); see also Dunkel, 927 F.2d at 956 ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim. [...] Judges are not like pigs, hunting for truffles buried in briefs.") (citation omitted). Moreover, the allegations Corent cites to for the '136 Patent are conclusory and not supported by the specification. (See id. (citing Counterclaims, Dkt. No. 57 ¶¶ 67, 74); Counterclaims ¶ 67 (alleging, without citation, "[t]he invention of the '136 Patent solves these problems by creating a new and unconventional architecture that creates and utilizes partitions of workloads").) See RFC Lenders, 2026 WL 1162746, at *3 ("Conclusory allegations need not be credited as true at the motion-to-dismiss stage[.]").

Corent argues that the ordered combination of elements in Claim 1 of the '136 Patent and Claim 1 of the '761 Patent provide concrete, technical benefits that supply an inventive concept. (Opp'n at 23.) But as explained in Section III.A.2.c supra, any "efficiency that is gained" from using the claimed invention comes from the fact that implementing the abstract ideas—i.e., grouping workloads and assigning them to cloud computing resources or monitoring and measuring user activity—can "make[] tasks more efficient." See Broadcom, 2022 WL 3155410, at *2. The "technical benefits" Corent identifies flow from the abstract ideas and cannot form the basis of the inventive concept. See id.

In conclusion, Claim 1 of the '136 Patent and Claim 1 of the '761 Patent do not contain an inventive concept.

### *C. Corent's Procedural Arguments*

Corent argues dismissal is inappropriate at a motion to dismiss because the question of whether the claimed elements or claimed combinations are well-understood, routine, and conventional is a question of fact. (Opp'n at 24 (citing Aatrix, 882 F.3d at 1128). As explained above, the intrinsic evidence establishes that the claims do not contain an inventive concept as a matter of law. And although the Court must credit concrete allegations, "[c]onclusory allegations need not be credited as true

at the motion-to-dismiss-stage, including allegations contradicted by the specification." RFC Lenders, 2026 WL 1162746, at *3. "[T]here are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." Aatrix, 882 F.3d at 1125. So, the Court may dismiss the claims on a 12(b)(6) motion. See id.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** the motion.

**IT IS SO ORDERED.**